Filed 9/9/21

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF
CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| FRED WESSON, | B302988 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC593889) |
| v. | |
| STAPLES THE OFFICE SUPERSTORE, LLC, | |
| Defendant and Respondent. | |

APPEAL from orders of the Superior Court of Los
Angeles County, Carolyn B. Kuhl, Judge. Affirmed.

---

* Pursuant to California Rules of Court, rules 8.1100 and
8.1110, this opinion is certified for publication with the exception
of part B of the Discussion.

Schneider Wallace Cottrell Konecky, Todd M. Schneider, Carolyn H. Cottrell and David C. Leimbach; Boucher, Raymond P. Boucher and Maria L. Weitz, for Plaintiff and Appellant.

Morrison & Foerster, Tritia M. Murata, David P. Zins and Maya Harel, Karen J. Kubin and James R. Sigel, for Defendant and Respondent.

---

## INTRODUCTION

This appeal raises a question of first impression: whether trial courts have inherent authority to ensure that PAGA claims will be manageable at trial, and to strike such claims if they cannot be managed. We hold that courts possess this authority.

Appellant Fred Wesson worked for respondent Staples the Office Superstore, LLC (Staples) as a store general manager (GM). He brought this action against Staples, asserting, among other things, a representative claim under the Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.) on behalf of himself and 345 other current and former Staples GMs in California. In his PAGA claim, Wesson sought almost $36 million in civil penalties for alleged Labor Code violations, all premised on the theory that Staples had misclassified its GMs as exempt executives.

Staples moved to strike Wesson's PAGA claim, arguing that given the number of employees it covered and the

nature of his allegations, the action would be "unmanageable" and would violate Staples's due process rights. It contended that its intended affirmative defense -- that it properly classified its GMs as exempt and thus committed no Labor Code violations -- would require individualized proof as to each GM, and thus that the claim could not be fairly and efficiently litigated. In his opposition, Wesson contended that the trial court lacked authority to ensure that PAGA actions are manageable, and argued that even if the court had such authority, it was sufficient that his prima facie case was manageable; whether Staples's affirmative defense could be managed at trial, Wesson contended, was irrelevant. While Staples's motion was pending, Wesson moved for summary adjudication of his PAGA claim.

The trial court invited Wesson to submit a trial plan showing that his PAGA action would be manageable at trial. In response, Wesson continued to insist that the court lacked authority to require that his claim be manageable, and laid out his plan to prove his prima facie case using common proof, but declined to address how the parties could litigate Staples's affirmative defense. Following this response, the court concluded that the PAGA claim could not be managed at trial and granted Staples's motion to strike it. Given this ruling, the court found no need to consider Wesson's motion for summary adjudication as to his PAGA claim and denied the motion.

3

Wesson challenges both rulings on appeal. He claims the court erred in failing to consider his motion for summary adjudication, as it had the potential to narrow the issues and make the action more manageable. He contends the court should have granted his motion because Staples had failed to provide individualized evidence in support of its exemption defense, at least as to some GMs. As to Staples's motion to strike, Wesson repeats his arguments that the court had no authority to strike his PAGA claim as unmanageable, and that any manageability assessment need not have considered Staples's affirmative defense. He adds that Staples had no due process right to present individualized evidence in support of its defense.

In the unpublished portion of this opinion, we conclude that Wesson was not entitled to summary adjudication, as Staples presented sufficient evidence to support its exemption defense as to all GMs. In the published portion, we draw on established principles of the courts' inherent authority to manage litigation, including ensuring the manageability of representative claims, and conclude that: (1) courts have inherent authority to ensure that PAGA claims can be fairly and efficiently tried and, if necessary, may strike claims that cannot be rendered manageable; (2) as a matter of due process, defendants are entitled to a fair opportunity to litigate available affirmative defenses, and a court's manageability assessment should account for them; and (3) given the state of the record and Wesson's lack of cooperation with the trial court's manageability inquiry, the

4

court did not abuse its discretion in striking his PAGA claim as unmanageable. We therefore affirm.

## BACKGROUND

*A. Wesson's Action and the Denial of Class Certification*

Staples is a global provider of office products and services to individuals and businesses. As of 2019, it operated about 150 big-box stores in California. Each Staples store is managed by a GM. Wesson was the GM of various Staples stores in Los Angeles County between 2006 and 2016.

In 2015, Wesson brought this action against Staples, alleging causes of action for, inter alia, unpaid overtime and failure to provide rest and meal periods. He later amended his complaint to add a cause of action seeking civil penalties under PAGA. Wesson's PAGA claim covered 346 Staples GMs, including Wesson, and sought almost $36 million in civil penalties under the Labor Code. Each of Wesson's claims was premised on the theory that Staples had misclassified its California GMs as exempt executives (who are not entitled to overtime pay and off-duty meal and rest periods), when in fact they should have been classified as non-exempt, hourly employees.

Wesson moved to certify a class of Staples California GMs, but the trial court denied the motion, concluding he had not demonstrated that his claims were susceptible to common proof. The court found that important factual questions relating to whether GMs spent most of their

5

worktime doing exempt, managerial tasks could not be resolved on a classwide basis.[1]  It reasoned that there was too much variation in how Staples GMs performed their jobs and the extent to which they performed non-managerial tasks.  Wesson does not challenge this ruling on appeal.

### B. *Staples's Motion to Strike the PAGA Claim as Unmanageable*

Following the court's denial of class certification, Staples moved to strike Wesson's PAGA claim, invoking the court's inherent authority to manage complex litigation.  It argued the claim would be unmanageable at trial and would violate Staples's due process rights.  In support, Staples pointed to evidence that the GM position was not standardized, and that there was great variation in how Staples GMs performed their jobs and the extent to which they performed non-exempt tasks.  According to Staples's evidence, Staples stores varied widely in size, sales volume, staffing levels, labor budgets, store hours, customer-traffic levels, products and services offered for sale, and many other variables, all of which affected GMs' work experience.  Staples's evidence also tended to show that how GMs spent their time depended on their experience, aptitude, and

---

[1]    As explained below, the executive exemption generally requires that the employee spend the majority of his or her time doing exempt work, meaning managerial tasks and other closely related functions.  (See *Safeway Wage & Hour Cases* (2019) 43 Cal.App.5th 665, 676-678 (*Safeway*).)

6

managerial approaches, as well as the size and composition of their management teams. Relying on this evidence and on the trial court's findings in denying class certification, Staples argued that Wesson's claims would require individualized assessments of each GM's classification, and would lead to "an unmanageable mess" that "would waste the time and resources of the Court and the parties."

In his opposition, Wesson contended that the trial court lacked authority to ensure that PAGA actions are manageable. He argued that imposing a manageability requirement would immunize employers from liability and defeat PAGA's purpose. Alternatively, Wesson claimed that even if the court could require that a PAGA claim be manageable, it should consider only the ability to try plaintiff's prima facie case, not the manageability of any affirmative defense.

Before ruling on the merits of Staples's motion, the trial court concluded it had inherent power to strike an unmanageable PAGA claim. It then invited Wesson to submit a trial plan showing that his claim would be manageable, and permitted him to file a supplemental brief in opposition to Staples's motion.

*C. Wesson's Motion for Summary Adjudication*

Shortly before Wesson was to submit his trial plan, he moved for summary judgment or, in the alternative, summary adjudication on his PAGA claim. We discuss the parties' respective evidence relating to Wesson's motion in

7

the unpublished portion of this opinion addressing his challenge to the court's ruling on his motion.

   *D. Wesson's Trial Plan and Supplemental Opposition to Staples's Motion to Strike*

   In his supplemental opposition to Staples's motion to strike his PAGA claim, Wesson reiterated his position that the court lacked authority to ensure the manageability of his claim. He also repeated his argument that any manageability assessment should not consider Staples's affirmative defense. Wesson agreed that to litigate its exemption defense, "Staples [would] need to proffer 'a GM-by-GM, week-by-week analysis' throughout the entire relevant time period that all of the GMs were properly classified as exempt executives." But he asserted that "a manager misclassification PAGA claim is 'manageable' so long as [the] plaintiff's prima facie case, concerning each aggrieved employee at issue, is provable by resort to common evidence."

   In his trial plan, Wesson explained he intended to prove up his prima facie case using common proof, establishing that GMs did not receive off-duty meal and rest breaks and worked overtime without receiving overtime pay. However, he did not attempt to address how the parties could litigate Staples's exemption defense. He stated that it would be improper for him to "dictate how Staples should go about proving its exemption defense," and that he would not attempt to prevent Staples from proving its affirmative

8

defense as it saw fit. According to Wesson's trial plan, Staples would "be permitted to present whatever evidence it want[ed], be it testimony of GMs, supervisors, corporate representatives, documentary evidence of Staples' policies, procedures, and expectations, or any other evidence Staples deem[ed] necessary." At a subsequent hearing on Staples's motion, the parties estimated they would need a total of six trial days per GM to litigate GMs' classification as exempt executives on an individual basis. Based on that estimate, the trial would have lasted eight years.

### E. The Trial Court's Rulings

The trial court ultimately granted Staples's motion to strike Wesson's PAGA claim. The court reiterated its conclusion that it had authority to ensure the manageability of a PAGA claim, reasoning that courts have inherent powers to control litigation before them and that PAGA was a procedural vehicle, rather than a substantive claim. It found additional support for its conclusion in the courts' imposition of judicially created manageability requirements in the context of class actions and representative Unfair Competition Law (UCL) claims.

The court then proceeded to find Wesson's PAGA claim unmanageable. It emphasized that Wesson's trial plan did not address how the parties might litigate Staples's affirmative defense, and noted its prior findings, in denying class certification, regarding the great variation in how Staples GMs performed their jobs and the extent to which

9

they perform non-managerial tasks. The trial court found no evidence that Staples's defense could be litigated through common proof. Noting the parties' estimates of the time they would need to litigate the exemption defense, the court stated that even cutting those estimates in half would result in a trial lasting more than four years. The court thus concluded, "A four-year trial involving witnesses and documents individually pertaining to each of 346 General Managers does not meet any definition of manageability."

In a separate order, the trial court denied Wesson's motion for summary judgment or summary adjudication. As to Wesson's PAGA claim, the court concluded that because it decided to strike the claim, there was no need to address it. Wesson timely appealed, challenging the court's striking of his PAGA claim and its denial of his motion for summary adjudication.

## DISCUSSION

### A. *Legal Background*

#### 1. *PAGA*

"'The State's labor law enforcement agencies -- the Labor and Workforce Development Agency (LWDA) and its constituent departments and divisions -- are authorized to assess and collect civil penalties for specified violations of the Labor Code committed by an employer.'" (*Raines v. Coastal Pacific Food Distributors, Inc.* (2018) 23 Cal.App.5th 667, 673.) In 2003, citing inadequate funding for

10

enforcement of labor laws, the Legislature enacted PAGA to "authorize[] an employee to bring an action for civil penalties on behalf of the state against his or her employer for Labor Code violations committed against the employee and fellow employees, with most of the proceeds of that litigation going to the state." (*Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 360.) The statute was intended "'to punish and deter employer practices that violate the rights of numerous employees under the Labor Code.'" (*Id.* at 384.) Thus, a PAGA action "'"is fundamentally a law enforcement action"' that 'substitute[s] for an action brought by the government itself.'" (*Iskanian v. CLS Transportation Los Angeles, LLC, supra,* at 394, quoting *Arias v. Superior Court* (2009) 46 Cal.4th 969, 986 (*Arias*).) A PAGA plaintiff acts "as the proxy or agent of the state's labor law enforcement agencies." (*Arias, supra*, at 986.) In other words, PAGA is "simply a procedural statute allowing an aggrieved employee to recover civil penalties . . . that otherwise would be sought by state labor law enforcement agencies." (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1003 (*Amalgamated Transit Union*).)

## 2. *The Executive Exemption*

Among the Labor Code provisions a PAGA plaintiff may seek to enforce are those imposing overtime and rest and meal period requirements. (See Lab. Code, §§ 226.7, 510-512, 1194, 2699.) As relevant here, California Industrial

11

Welfare Commission (IWC) Wage Order No. 7-2001, which governs employees of the mercantile industry and is codified in the California Code of Regulations, largely exempts "executive" employees from these requirements.[2] (IWC, Wage Order No. 7-2001 (Jan. 1, 2001), Cal. Code Regs., tit. 8, § 11070, subd. 1(A).) This exemption is an affirmative defense that the employer has the burden to prove. (*Safeway*, *supra*, 43 Cal.App.5th at 671.)

To be an exempt executive, an employee must: (1) earn a salary of at least twice the minimum wage for full-time employment; (2) be involved in managing the enterprise or a relevant department; (3) customarily and regularly direct the work of two or more employees; (4) have the authority to hire or fire, or have recommendations regarding such matters receive particular weight; (5) customarily and regularly exercise discretion and independent judgment; and (6) be "primarily engaged in duties which meet the test of the exemption."[3] (Cal. Code Regs., tit. 8, § 11070, subd.

---

[2] It is undisputed that Staples is in the mercantile industry. The IWC was defunded in 2004, but its wage orders remain in effect. (*Batze v. Safeway, Inc.*, (2017) 10 Cal.App.5th 440, 471, fn. 34.) The California Supreme Court has instructed that "[t]he IWC's wage orders are to be accorded the same dignity as statutes." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1027.)

[3] For purposes of the wage order, "'[p]rimarily'" means "more than one-half the employee's work time." (Cal. Code Regs., tit. 8, § 11070, subd. 2(K).) Other exemptions include a similar requirement that employees spend most of their time on (*Fn. is continued on the next page*.)

1(A)(1).)  The wage order defines the "duties which meet the test of the exemption" by reference to corresponding federal regulations.  (*Id.*, § 11070, subd. (1)(A)(1)(e) [referring to 29 C.F.R. §§ 541.102, 541.104-111 & 541.115-116 (2001)].)

Under the relevant federal regulations, managerial and supervisory tasks within the scope of the exemption are generally "'easily recognized'" and include such tasks as: "'[i]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; [and] apportioning the work among the workers . . . .'" (*Safeway*, *supra*, 43 Cal.App.5th at 676-677, quoting 29 C.F.R. §§ 541.102(a) & (b) (2001).)  The federal regulations also recognize a category of exempt tasks that may not be so easily identifiable as exempt:  tasks that are not inherently managerial or supervisory but are "'directly and closely

---

appropriate duties under the relevant exemption.  (See, e.g., *id.*, § 11070, subds. 1(A)(2)(f) [administrative exemption], 1(A)(3)(b) [professional exemption], (2)(J) [outside salesperson exemption].)

13

related'" to those functions.[4]  (*Safeway* at 677, quoting § 541.108 (2001).)

By contrast, non-exempt work includes all work that is neither management or supervision nor directly and closely related to those functions.  (*Safeway*, *supra*, 43 Cal.App.5th at 678.)  "'[I]n the usual case, it consists of work of the same nature as that performed by the nonexempt subordinates of the "executive."'"  (*Ibid.*, quoting 29 C.F.R. § 541.111(b) (2001).)

---

[4]    The regulations provide examples of tasks that may be "directly and closely related" to managerial or supervisory functions:

"(b) Keeping basic records of working time . . . is frequently performed by a timekeeper employed for that purpose.  In such cases the work is clearly not exempt in nature.  In other establishments which are not large enough to employ a timekeeper, or in which the timekeeping function has been decentralized, the supervisor of each department keeps the basic time records of his own subordinates.  In these instances, . . . the timekeeping is directly related to the function of managing the particular department and supervising its employees. . . .

"(c) Another example of work which may be directly and closely related to the performance of management duties is the distribution of materials or merchandise and supplies. . . .  In [some] establishments it is not uncommon to leave the actual distribution of materials and supplies in the hands of the supervisor.  In such cases it is exempt work since it is directly and closely related to the managerial responsibility of maintaining the flow of materials. . . ."  (29 C.F.R. § 541.108 (2001).)

In determining whether an employee is "primarily engaged" in exempt duties under the IWC wage order, the "first and foremost" consideration is the "work actually performed by the employee during the course of the workweek . . . ." (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(e).) However, a factfinder must also consider "the employer's realistic expectations and the realistic requirements of the job . . . ." (*Ibid.*) As our Supreme Court has explained in discussing the analogous "outside salesperson" exemption, "an employee who is supposed to be engaged in [exempt tasks] during most of his [or her] working hours and falls below the 50 percent mark due to his [or her] own substandard performance should not thereby be able to evade a valid exemption." (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 802 (*Ramirez*).) A factfinder should therefore "consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." (*Ibid.*)

B. *Wesson's Motion for Summary Adjudication*

Wesson argues the trial court erred in denying his summary adjudication motion without considering it. He contends that because ruling on his motion could have obviated or altered the court's manageability assessment, the court was required to consider it before reaching

15

Staples's motion to strike his PAGA claim.  Assuming arguendo that the trial court erred in failing to consider Wesson's summary adjudication motion as to the PAGA claim, we conclude the motion failed on the merits.

### 1. *Factual Background*

In support of summary adjudication on his PAGA claim, Wesson provided GMs' work schedules, Staples policy documents, and deposition testimony by Staples's corporate designee to prove that all 346 GMs worked overtime but received no overtime pay and no off-duty meal and rest periods.  He also offered the declarations of 31 current and former Staples GMs, in addition to his own declaration.[5] Wesson and the other declarants all stated, inter alia, that they spent most of their worktime as GMs doing the same non-managerial work their non-exempt subordinates did and could not realistically do their job any other way due to Staples's rigid limitations on hiring hourly employees and tight labor budgets.

In opposition, Staples submitted declarations from two of its regional vice presidents, Laurence Newell, Jr. and Timothy Bernicke, whose combined regions included almost 250 Staples stores.  The two regional vice presidents described Staples stores as large-scale and complex

---

[5]    It is undisputed that of the 31 GMs who provided declarations in support of Wesson's action, 19 had left Staples before the period relevant to his PAGA claim.

operations with multiple departments who all reported to the GM. Newell noted that stores had anywhere between "around 10 to 12 Associates on the low end" and "around 40 Associates on the high end . . . ." According to both declarants, the GM was the only exempt employee in any given store. As to GMs' salaries, Newell testified they were paid $50,000-$100,000, plus bonuses.

Newell and Bernicke provided extensive descriptions of GMs' job responsibilities, which included numerous inherently managerial functions. Both testified that GMs were ultimately responsible for all aspects of their stores' operations: they were required to assess the stores' financial performance and develop strategies to maximize profitability. GMs developed their own strategies regarding such issues as product placement, marketing and networking, and response to competition. GMs were also responsible for hiring, training, and coaching staff, scheduling and assigning work, promoting employees, and disciplining (including recommending termination), as necessary.

According to Newell and Bernicke, there was great variation in the way GMs performed their jobs and managed their stores, as every store was different, every GM had his or her own management style and strategic vision, and GMs had complete discretion in deciding how to spend their time. However, both asserted that Staples expected GMs to spend most of their time managing their stores, and that those who spent too much of their time doing non-managerial work

17

were counseled accordingly. They explained that each Staples store had a customized labor budget, which GMs' managerial decisions could impact. The labor budget was designed to provide sufficient labor, so that hourly employees would perform hourly work and GMs would remain free to manage the stores.

Staples also provided declarations from 31 GMs, including the GM who took over Wesson's former store. Consistent with the declarations of Newell and Bernicke, these GMs testified that they spent the vast majority of their time doing managerial work, that their labor budgets were sufficient and did not require them to do a significant amount of hourly work, and that Staples did not expect them to do hourly work. Some of these declarants opined that if a GM did too much hourly work, it was because he or she was mismanaging the store and accepting low-quality work from subordinates. As noted, after deciding to strike his PAGA claim, the trial court denied Wesson's motion as it pertained to that claim without considering it.

### 2. *Governing Principles*

"'A summary adjudication motion is subject to the same rules and procedures as a summary judgment motion.'" (*Case v. State Farm Mutual Automobile Ins. Co., Inc.* (2018) 30 Cal.App.5th 397, 401.) "Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.'" (*Regents of University of California v.*

18

*Superior Court* (2018) 4 Cal.5th 607, 618.)  The moving party bears the burden of persuasion that there is no triable issue of material fact.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  We liberally construe the evidence in support of the non-moving party and resolve evidentiary doubts in its favor.  (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

We review the denial of summary adjudication de novo. (*Advanced-Tech Security Services, Inc. v. Superior Court* (2008) 163 Cal.App.4th 700, 705.)  We will affirm the ruling if it is correct based on any applicable theory.  (See *Capra v. Capra* (2020) 58 Cal.App.5th 1072, 1094 ["'[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason'"].)

### 3. *Analysis*

Wesson was not entitled to summary adjudication because Staples's evidence created a triable issue as to each GM's proper classification as an exempt executive.[6]  The declarations of Staples's regional vice presidents, Newell and Bernicke, evidenced that GMs (1) earned more than the

---

[6]  Given our conclusion, we need not address Staples's additional arguments that Wesson failed to establish his standing to bring his PAGA claim as matter of law and that he could not obtain summary adjudication as to only some GMs.

19

required salary ($50,000-$100,000, by Newell's account),[7] (2) managed their respective stores, (3) regularly directed the work of two or more employees (between 10 and 40, according to Newell), (4) had the authority to hire and recommend termination,[8] and (5) regularly exercised discretion and independent judgment in managing their stores (e.g., when hiring, training, and coaching staff, scheduling and assigning work, and developing strategies regarding product placement and marketing). (See Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1).) This evidence created triable issues on five of the exemption's six elements.

Wesson's sole contention to the contrary is that to defeat summary adjudication, Staples was required to provide evidence specific to each of the 346 relevant GMs. However, he offers neither argument nor authority in support of this proposition, and has therefore forfeited the contention. (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545 ["'an appellate brief "should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration"'"].) In any case, we see no reason why knowledgeable members of a company's senior management cannot testify about the

---

[7]     Wesson does not dispute that these amounts were more than twice the minimum wage for full-time employment during the relevant period.

[8]     Wesson also does not dispute that GMs' recommendations on termination decisions were entitled to particular weight.

characteristics of a certain class of employees, including their salary, authority, responsibilities, and typical duties.

As to the remaining element of the exemption, Staples provided sufficient evidence to show that under its realistic expectations and the realistic requirements of the job, GMs were to spend most their time on managerial tasks. In their declarations, Newell and Bernicke extensively discussed GMs' managerial job duties and explained that GMs were responsible for all aspects of their stores' operations. They testified that Staples expected GMs to spend most of their time managing their stores, that the stores' labor budgets were designed to provide sufficient labor and allow GMs to spend their time doing managerial work, and that those who spent too much of their time doing non-managerial work were counseled accordingly.

The declarations Staples provided from 31 GMs further evidenced that Staples expected GMs to spend their time on managerial tasks and that its expectation was realistic. These GMs all testified that they spent the vast majority of their time on managerial work, that this was consistent with Staples's expectations, and that their labor budgets were sufficient and did not require them to spend much time on hourly work. Some of these Staples GMs opined that excessive hourly work by a GM signified that the GM was mismanaging the store and its employees.

The evidence therefore tended to show that Staples expected its GMs to spend most of their time managing their stores, that this expectation was realistic, that any GM who

21

failed to meet this expectation did so due to his or her own substandard performance, and that Staples would express its displeasure over such performance.  On this showing, a reasonable factfinder could conclude that Staples properly treated all its GMs as exempt executives based on its "realistic expectations and the realistic requirements of the job . . . ."  (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(e); accord, *Ramirez, supra*, 20 Cal.4th at 802.)

Wesson argues that Staples was required to provide individualized evidence as to how each of the 346 GMs actually spent their time, the "first and foremost" consideration under the IWC's wage order.  (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(e).)  Yet our Supreme Court has made clear that this consideration is not dispositive, explaining that employees who are supposed to spend most of their time on exempt tasks, but do not do so due to their own "substandard performance," should not be able to evade a valid exemption.[9]  (*Ramirez, supra*, 20 Cal.4th at 802.)  As

_____

[9]     We reject Wesson's suggestion that *Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 26 (*Duran*) supports his position, as that case did not address the parties' respective burdens of production on summary adjudication, let alone hold that to avoid summary adjudication, an employer must provide proof of how each of hundreds of individual employees actually spent his or her time.  As explained, *Ramirez* establishes that an employee's work habits are not dispositive.  Indeed, Justice Liu's special concurrence in *Duran*, which joined the court's opinion in full, stated that "'the employer's realistic expectations' or 'the
(*Fn. is continued on the next page.*)

22

discussed, Staples provided evidence that it realistically expected all its GMs to spend most of their time on managerial tasks, and that to the extent any GMs failed to do so, it was due to their own substandard performance. In short, Wesson was not entitled to summary adjudication on his PAGA claim.

### C. *Staples's Motion to Strike Wesson's PAGA Claim*

Wesson claims the trial court erred in striking his claim as unmanageable. He asserts that the court lacked authority to ensure the manageability of a PAGA action because, inter alia, a manageability assessment would violate PAGA's procedures, conflict with California Supreme Court precedent, and undermine PAGA's objectives. Alternatively, Wesson contends that the court erred in determining that his claim was unmanageable.

No published California decision has considered trial courts' power to ensure the manageability of PAGA claims.[10]

---

realistic requirements of the job'" were "the ultimate issue" in assessing the exemption's applicability. (*Duran, supra*, at 53.)

[10] Federal district courts applying California law have split on whether courts possess inherent authority to strike PAGA claims as unmanageable. (Compare, e.g., *Salazar v. McDonald's Corp.* (N.D.Cal., Jan. 5, 2017, No. 14-cv-02096-RS) 2017 U.S.Dist.LEXIS 9641, at *26 [relying on California cases involving representative UCL claims in concluding that California courts would exercise inherent power to strike unmanageable PAGA claims]; *Ortiz v. CVS Caremark Corp.* (*Fn. is continued on the next page*.)

23

We conclude that courts have inherent authority to ensure that a PAGA claim will be manageable at trial -- including the power to strike the claim, if necessary -- and that this authority is not inconsistent with PAGA's procedures and objectives, or with applicable precedent. Moreover, on the record before us, we conclude the trial court did not abuse its discretion in striking Wesson's claim as unmanageable.

---

(N.D.Cal., May 30, 2014, No. C -12-05859 EDL) 2014 U.S.Dist.LEXIS 198344, at *7 [striking PAGA claim based on court's "inherent authority to control its cases"]; and *Raphael v. Tesoro Refining & Marketing Co. LLC* (C.D.Cal., Sept. 25, 2015, Case No. 2:15-cv-02862-ODW) 2015 U.S.Dist. Lexis 130532, at *6-*7 [striking PAGA claim as unmanageable where court "would have to engage in a multitude of individualized inquiries" to assess alleged violations as to thousands of employees]; with, e.g., *Plaisted v. Dress Barn, Inc.* (C.D.Cal., Sep. 20, 2012, Case No. 2:12-cv-01679-ODW (SHx)) 2012 U.S.Dist. LEXIS 135599, at *9-*10 [manageability requirement would obliterate PAGA's purpose]; *Zackaria v. Wal-Mart Stores, Inc.* (C.D.Cal. 2015) 142 F. Supp. 3d 949, 959 manageability requirement is "inconsistent with PAGA's purpose and statutory scheme"]; and *Zayers v. Kiewit Infrastructure W. Co.* (C.D.Cal., Nov. 9, 2017, No. 16-CV-06405 PSG (PJW)) 2017 U.S.Dist. LEXIS 216715, at *29 [same].) Cases finding courts lack inherent authority have generally concluded that a manageability requirement would be inconsistent with PAGA's purposes. (See, e.g., *Zackaria v. Wal-Mart Stores, Inc.*, *supra*, at 959.) We discuss below why we find this reasoning unpersuasive.

24

1. *Legal Background*
     a. *Courts Have Inherent Authority to Manage Proceedings Before Them*

"From their creation by article VI, section 1 of the California Constitution, California courts received broad inherent power . . . ." (*Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 758 (*Slesinger*).) "This inherent power includes 'fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation.'" (*Ibid.*, quoting *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967.)

The courts' inherent authority ""arises from necessity where, in the absence of any previously established procedural rule, rights would be lost or the court would be unable to function."" (*Weiss v. People ex rel. Dept. of Transportation* (2020) 9 Cal.5th 840, 863 (*Weiss*).) Thus, California courts have recognized that ""judges must be permitted to bring management power to bear upon massive and complex litigation to prevent it from monopolizing the services of the court to the exclusion of other litigants."" (*Cohn v. Corinthian Colleges, Inc.* (2008) 169 Cal.App.4th 523, 531 (*Cohn*); accord, *First State Insurance Co. v. Superior Court* (2000) 79 Cal.App.4th 324, 334.) Similarly, courts may exercise their inherent authority to fashion procedures and remedies as necessary to protect litigants' rights and the fairness of trial, including by terminating the litigation. (See *Slesinger, supra*, 155 Cal.App.4th at 740, 762 [absent alternative that would ensure fair trial, courts have inherent

power to impose terminating sanction for egregious misconduct].) The courts' inherent authority is not boundless, of course, and may be exercised only to the extent it is not inconsistent with the federal or state constitutions, or California statutory law. (*Ibid.*)

b. *Courts Have Exercised Their Authority to Ensure the Manageability of Representative Actions*

California courts have exercised their inherent powers to preclude representative claims where a trial of those claims would be unmanageable. In the class action context, the courts have required class action proponents to demonstrate that "litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently." (*Duran, supra,* 59 Cal.4th at 28-29; accord, *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 922 (*Washington Mutual*) [class action proponent must demonstrate manageability], citing, e.g., *Canon U.S.A., Inc. v. Superior Court* (1998) 68 Cal.App.4th 1, 5 (*Canon*) and *Rose v. Medtronics, Inc.* (1980) 107 Cal.App.3d 150, 157 (*Rose*).) The statutory provision that authorizes class actions, Code of Civil Procedure section 382, contains no such requirement.[11]

---

[11] Code of Civil Procedure section 382 provides: "[W]hen the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to
(*Fn. is continued on the next page.*)

26

Similarly, at least one Court of Appeal approved a trial court's use of its inherent authority to bar a representative pre-2004 UCL claim as unmanageable.[12]  In *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861 (*South Bay Chevrolet*), the plaintiff sought to advance a representative UCL claim on behalf of a certain class of California automotive dealers.  (*South Bay Chevrolet, supra,* at 869.)  After the plaintiff presented its

---

bring them all before the court, one or more may sue or defend for the benefit of all."  The courts have developed other class action requirements that find no mention in this provision, including "the typicality of claims, the ability of the named plaintiff to provide fair and adequate representation, the superiority of a class action over other methods of adjudication, . . . and the requirement of notice."  (*Arias*, *supra*, 46 Cal.4th at 989, fn. 3 (conc. opn. of Werdegar, J.).)

Wesson argues that the courts' power to require manageability in class actions derives from California Rule of Court 3.767 -- which empowers them to strike allegations as to representation of absent persons in class action pleadings -- rather than from their inherent authority.  However, this rule was adopted only in 2002, long after California courts began requiring putative class action plaintiffs to demonstrate their actions would be manageable at trial.  (See, e.g., *Canon*, *supra*, 68 Cal.App.4th at 5; *Rose*, *supra*, 107 Cal.App.3d at 157.)  Demonstrably, the courts' authority did not stem from this rule.

[12]    Before 2004, any person could assert representative UCL claims, including for restitution, without satisfying class action requirements.  (See former Bus. & Prof. Code, §§ 17203, 17204; *Arias*, *supra*, 46 Cal.4th at 977.)  In 2004, Proposition 64 amended the UCL to require that representative actions comply with class action requirements.  (*Arias, supra*, at 977.)

case at trial, the trial court granted the defendant's motion for judgment under Code of Civil Procedure section 631.8, finding that the plaintiff offered no evidence that the dealerships were similarly situated, and thus that due to uniquely individual questions of fact, minitrials would be necessary with respect to each dealership. (*South Bay Chevrolet, supra,* at 869, 891.) Although the statutory provision that authorized representative UCL suits included no manageability requirement (see former Bus. & Prof. Code, § 17204), the court concluded that the plaintiff's representative action "'could not be efficiently tried'" and was therefore "'not appropriate'" (*South Bay Chevrolet*, at 891). The Court of Appeal affirmed, holding that the trial court had "acted within its discretion" because the evidence was "not sufficiently uniform to allow representative treatment . . . ."[13] (*Id.* at 897.)

---

[13] Wesson contends that UCL precedents involving manageability requirements are not instructive in determining courts' authority in PAGA actions. He argues pre-2004 representative UCL claims were equitable in nature, and thus that courts weighed equitable considerations in deciding if they should proceed, and did so only in addressing the scope of restitutionary relief. He also claims that unlike PAGA claims, those UCL actions implicated the due process rights of non-parties, whose interests were to be adjudicated.

In so arguing, Wesson fails to address *South Bay Chevrolet*, despite the trial court's reliance on it below and Staples's reliance on it on appeal. There, the trial court and the Court of Appeal relied on neither uniquely equitable considerations, nor special

(*Fn. is continued on the next page.*)

28

Notably, in both the class action and the representative UCL claim context, barring a claim as unmanageable does not affect the parties' substantive rights. Instead, this remedy precludes the plaintiffs' particular use of an aggregation procedure, leaving in place any substantive claim by an absent class member or UCL claimant. (See *Duran*, *supra*, 59 Cal.4th at 29 [court considers "whether a class action is a superior device for resolving a controversy"]; *South Bay Chevrolet*, *supra*, 72 Cal.App.4th at 897 [evidence did not allow "representative treatment" of UCL claim].)

2. *Trial Courts Have Inherent Authority to Ensure that PAGA Claims Will Be Manageable at Trial*

Drawing on these principles of the courts' inherent authority to manage litigation, including ensuring the manageability of representative claims, we conclude that courts have inherent authority to ensure that PAGA claims can be fairly and efficiently tried and, if necessary, may strike a claim that cannot be rendered manageable. The same concerns attendant to the fair and efficient trial of representative claims apply in the context of PAGA actions.

characteristics of restitutionary relief, nor the due process rights of non-parties. Rather, the courts cited the need for efficient trial of the claims (*South Bay Chevrolet*, *supra*, 72 Cal.App.4th at 891, 897), a matter firmly within the courts' generally applicable inherent authority (see *Weiss*, *supra*, 9 Cal.5th at 863; *Cohn*, *supra*, 169 Cal.App.4th at 531).

29

Under PAGA, an aggrieved employee may recover civil penalties for Labor Code violations "on behalf of himself or herself and other current or former employees . . . ." (Lab. Code, § 2699, subd. (a).) A PAGA action may thus cover a vast number of employees, each of whom may have markedly different experiences relevant to the alleged violations. Under those circumstances, determining whether the employer committed Labor Code violations with respect to each employee may raise practical difficulties and may prove to be unmanageable.

Indeed, PAGA claims may well present more significant manageability concerns than those involved in class actions. By its terms, PAGA includes no general requirement similar to the requirement in the class action context, that the plaintiff establish a well-defined community of interest, encompassing a showing that common questions predominate over individual ones. (See *Washington Mutual*, *supra*, 24 Cal.4th at 913 [discussing class action requirements]; *Williams v. Superior Court* (2017) 3 Cal.5th 531, 559 (*Williams*) [PAGA actions do not require showing of uniform policy because "recovery on behalf of the state and aggrieved employees may be had for each violation, whether pursuant to a uniform policy or not"].) Thus, a PAGA claim can cover disparate groups of employees and involve different kinds of violations raising distinct questions.

Although not addressing the question before us, the California Supreme Court has acknowledged the potential

for manageability difficulties in PAGA actions. In *Williams*, while rejecting a lower court's suggestion that discovery in a PAGA action could be made contingent on the plaintiff's ability to establish a uniform companywide policy, our Supreme Court noted that uniform policies may play a role in PAGA cases, explaining that "proof of a uniform policy is one way a plaintiff might seek to render trial of the action manageable." (*Williams*, *supra*, 3 Cal.5th at 559.)

We do not believe a court is powerless to address the challenges presented by large and complex PAGA actions and is bound to hold dozens, hundreds, or thousands of minitrials involving diverse questions, depending on the breadth of the plaintiff's claims. As explained above, courts have inherent authority to manage litigation with the aim of protecting the parties' rights and the courts' ability to function. (See *Weiss*, *supra*, 9 Cal.5th at 863; *Cohn*, *supra*, 169 Cal.App.4th at 531.) Equipped with this tool, courts dealing with representative claims pay close attention to manageability issues and intervene to ensure that the claims can be managed fairly and efficiently at trial. (See *Duran*, *supra*, 59 Cal.4th at 28-29; *South Bay Chevrolet*, *supra*, 72 Cal.App.4th at 869.) If they cannot, the courts preclude these aggregation procedures. (See *Duran*, at 28-29; *South Bay Chevrolet*, at 869.) Given that PAGA actions involve comparable or greater manageability concerns than other representative claims, we hold that trial courts may similarly exercise their inherent authority to ensure the

31

manageability of PAGA claims and, if necessary, may preclude the use of this procedural device.[14]

### 3. *Wesson's Arguments to the Contrary Are Unpersuasive*

In support of his position that courts may not require that PAGA claims be manageable at trial and may not strike an unmanageable claim, Wesson contends:  (1) *Arias* precludes any manageability requirement in PAGA cases; (2) existing PAGA procedures preclude judicial creation of additional procedures, including a manageability requirement; (3) a manageability assessment is inconsistent with PAGA's purposes; and (4) the state would not be subject to a manageability requirement and thus PAGA plaintiffs, acting as the state's agents, should likewise be free from this requirement.  As discussed below, we find none of these contentions convincing.

---

[14]     Wesson argues that a PAGA action is "a *substantive* claim for civil penalties, owned by the State of California" and thus that a PAGA claim "extinguishe[s] the State of California's property interests . . . ." (Italics omitted.)  He is mistaken.  As our Supreme Court explained, PAGA is "simply a procedural statute allowing an aggrieved employee to recover civil penalties . . . that otherwise would be sought by state labor law enforcement agencies." (*Amalgamated Transit Union*, *supra*, 46 Cal.4th at 1003.)  Preventing a plaintiff from using this procedure has no effect on the state's property rights; the state remains entitled to recover civil penalties for any Labor Code violations by the employer, subject to the applicable statute of limitations.

First, Wesson argues that requiring manageability in PAGA cases would run afoul of the California Supreme Court's holding in *Arias, supra*, 46 Cal.4th at 975 that class action requirements do not apply to PAGA actions. Not so. In *Arias*, the trial court granted the defendants' motion to strike the plaintiff's PAGA claim on the ground that he had failed to comply with class action pleading requirements. (*Arias, supra*, at 976.) After the Court of Appeal reversed this ruling, the defendant urged our Supreme Court to construe PAGA "as requiring that all actions under that act be brought as class actions." (*Arias*, at 984.) The high court declined, holding that PAGA claims need not satisfy class action requirements. (*Arias*, at 975.) In so doing, the court noted that PAGA actions may be brought as class actions but explained that at issue was "whether such actions *must* be brought as class actions." (*Arias*, at 992, fn. 5.) Thus, *Arias* stands for the proposition that PAGA claims need not qualify as class actions. *Arias* did not hold that any consideration relevant to class action certification is necessarily irrelevant in the context of PAGA. And nowhere did the court suggest that trial courts could not limit or preclude an unmanageable PAGA action, if necessary.

Second, Wesson contends that existing PAGA statutory procedures preclude the judicial imposition of a manageability requirement. Relying on *In re Marriage of Woolsey* (2013) 220 Cal.App.4th 881 (*Woolsey*), he argues that where a statute provides certain procedures, courts may not add to them. Wesson notes that the sole provision

33

supplying procedural requirements for PAGA actions, section 2699.3, requires only that a prospective PAGA plaintiff inform the LWDA and the employer of the alleged violations, pay the agency a filing fee, if applicable, and await its decision on whether it will investigate the matter. (See § 2699.3.)  Yet it is the narrow scope of section 2699.3's requirements that defeats Wesson's contention.

In *Woolsey*, the Court of Appeal held that courts could not impose additional procedural requirements on marriage settlements because the Legislature had already "imposed specific requirements for settlement agreements and provided an expedient method of enforcing them."  (*Woolsey*, *supra*, 220 Cal.App.4th at 899.)  According to the court, a trial court's refusal to enforce an agreement that complied with these requirements would thwart the Legislature's intent.  (*Id.* at 900.)  By contrast, section 2699.3 imposes only procedural preconditions to filing a PAGA suit, intended to afford the LWDA an "opportunity to decide whether to allocate scarce resources to an investigation . . . ."  (*Williams*, *supra*, 3 Cal.5th at 546.)  This provision includes no instruction relevant to the management of ongoing PAGA litigation and reveals no legislative intent that would preclude a court's exercise of its authority in this area.

Third, Wesson asserts that assessing PAGA actions for manageability would "'obliterate'" their purpose.  He argues that PAGA's punitive and deterrent objectives "cannot be accomplished if the State's claims are cast aside whenever an employer complains that its uniform employment

34

decisions cannot be justified absent a burdensome evidentiary showing." We are unpersuaded.

Contrary to Wesson's suggestion, ensuring the manageability of claims is not tantamount to discarding them on an employer's mere objection. His argument wrongly assumes that trial courts will be quick to deem every PAGA claim hopelessly unmanageable. (See *Mays v. Wal-Mart Stores, Inc.* (C.D.Cal., Nov. 1, 2018, Case No. CV 18-02318-AB (KKx)) 2018 U.S.Dist. LEXIS 223886, at *4, *13-*23 [concluding court had authority to strike unmanageable PAGA claims, but finding plaintiff's claim was manageable]; *Brown v. Am. Airlines, Inc.* (C.D.Cal., Oct. 5, 2015, CV 10-8431-AG (PJWx)) 2015 U.S.Dist. LEXIS 150672, at *10-11 [striking PAGA action only in part, after finding that although some claims were not manageable, claims relating to improper wage statements were manageable].) As discussed below, trial courts have discretion in assessing claims' manageability at trial but should not lightly strike even procedurally challenging claims. And many PAGA actions will raise no substantial manageability concerns, because of the number of employees involved, the nature of contested issues, or other factors. (Cf., e.g., *Gonzalez v. Millard Mall Servs.* (S.D.Cal., Aug. 21, 2012, Civil No. 09cv2076-AJB (WVG)) 2012 U.S.Dist. LEXIS 118133, at *2 [PAGA claim alleged defendants improperly issued employees out-of-state paychecks]; *Decker v. Allstates Consulting Servs.* (E.D.Cal., Dec. 30, 2020, No. 2:18-cv-03216-KJM-DB) 2020 U.S.Dist. LEXIS 244823, at *2, *8

35

[PAGA claim alleged failure to pay wages in timely manner, and failure to provide accurate itemized wage statements, as to about 16 employees]; *Mireles v. Paragon Sys.* (S.D.Cal., Feb. 9, 2016, Case No. 13-cv-00122-L-BGS) 2016 U.S.Dist. LEXIS 181284, at *11-*12 [PAGA notice alleged violations of overtime and rest- and meal-period requirements as to 13 hourly employees].) That some claims may not be able to proceed without limitation will not nullify PAGA's objectives.

Finally, Wesson asserts that state agencies' right to maintain Labor Code enforcement proceedings cannot be conditioned on manageability. Based on this premise, he argues that because PAGA plaintiffs act as agents of the state, they too should be free to maintain claims regardless of manageability considerations. However, Wesson cites no authority, and we are aware of none, privileging the state above other civil litigants and exempting it from the courts' inherent authority to manage the proceedings and ensure fair and efficient administration of justice.[15] While we think it unlikely that the state, in exercising its prosecutorial discretion, would choose to bring an unmanageable action requiring individualized determinations as to hundreds or thousands of differently situated employees, requiring years

---

[15] Wesson discusses state agencies' plenary power to *investigate* Labor Code violations and asserts that they are not subject to manageability criteria when "assesses[ing] whether an employer violated the Labor Code . . . ." These matters are irrelevant to the courts' authority to ensure the manageability of a trial.

of trial court time, we see no reason the court would not be authorized to intervene should that occur.

As we conclude that courts possess the power to ensure the manageability of PAGA claims at trial, including the power to strike claims, if necessary, we turn to consider the trial court's decision to strike Wesson's claim.

### 4. *The Trial Court Did Not Abuse its Discretion in Striking Wesson's Claims as Unmanageable*
#### a. *Governing Principles*

A court's exercise of its inherent power to control the proceedings before it, its assessment of manageability issues, and its ruling on a motion to strike are all reviewed for abuse of discretion. (*San Francisco Unified School Dist. ex rel. Contreras v. First Student, Inc.* (2013) 213 Cal.App.4th 1212, 1227 [exercise of inherent power]; *Duran, supra,* 59 Cal.4th at 25 [manageability issues]; *Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1497 [motion to strike].) A ruling constitutes an abuse of discretion when it is "'so irrational or arbitrary that no reasonable person could agree with it.'" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)

As in other contexts, manageability in the context of PAGA requires that individual issues can be tried fairly and efficiently. (Cf. *Duran, supra,* 59 Cal.4th at 28-29; *South Bay Chevrolet, supra,* 72 Cal.App.4th at 891, 897.) This assessment will depend on the circumstances of the case, and we do not believe any rigid rule can govern the court's

assessment.  In general, however, a need for individualized proof pertaining to a very large number of employees will raise manageability concerns.  (See, e.g., *Lopez v. Liberty Mut. Ins. Co.* (C.D.Cal., Feb. 11, 2020, Case No. 2:14-cv-05576-AB-JCx) 2020 U.S.Dist. LEXIS 45634, at *15 [striking PAGA claim as unmanageable because it "would require a multitude of individualized assessments"]; *Amiri v. Cox Communs. Cal., LLC* (C.D.Cal. 2017) 272 F.Supp.3d 1187, 1193 [PAGA claim may be unmanageable if it would require "numerous individualized determinations"].)

In considering manageability issues, courts should account for a defendant's affirmative defenses.  (Cf. *Duran*, *supra*, 59 Cal.4th at 28-29 ["In certifying a class action, the court must also conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently"].)  While trial courts "enjoy great latitude in structuring trials," a trial management plan must allow the defendant a fair opportunity to present a defense.  (*Id.* at 33; accord, *Philip Morris USA v. Williams* (2007) 549 U.S. 346, 353 ["the Due Process Clause prohibits a State from punishing an individual without first providing that individual with 'an opportunity to present every available defense'"].)  In *Duran*, a putative class action alleged that the defendant had improperly classified employees as exempt outside salespersons, denying them overtime pay in violation of the Labor Code.  (*Duran, supra*, at 12.)  The trial court certified a class of 260 plaintiffs and adopted a plan to determine the extent of the defendant's

liability by extrapolating from a sample of 20 employees, without a valid statistical model. (*Id*. at 16, 33.) The court then prevented the defendant from presenting evidence about any other class member, and found, based on testimony from the sample group, that the entire class had been misclassified as exempt. (*Id*. at 16, 35.) The California Supreme Court found this procedure impermissible: by improperly extrapolating liability findings from a small, unrepresentative sample group and refusing to admit evidence relating to employees outside that group, the trial court "significantly impaired" the defendant's ability to present a defense. (*Id*. at 33.) The *Duran* court concluded, "the trial court could not abridge [the defendant]'s presentation of an exemption defense simply because that defense was cumbersome to litigate in a class action." (*Id*. at 35.)

That is not to say that a defendant's trial plan for how to try an affirmative defense is inviolable. Where methods of common proof afford the defendant a fair opportunity to litigate every available defense, courts may limit the presentation of individualized evidence that would be cumulative or have little probative value. (See *Duran*, *supra*, 59 Cal.4th at 33; Evid. Code, § 352 [court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . necessitate undue consumption of time"].) What must be preserved is the defendant's ability to present the defense in a fair manner. (See *Duran, supra*, at 33.)

A trial court's finding that a claim is unmanageable as presented will not always result in striking the claim. In the class certification context, our Supreme Court approvingly quoted a federal court's explanation: "'[i]f faced with what appear to be unusually difficult manageability problems at the certification stage, district courts have discretion to insist on details of the plaintiff's plan for . . . managing the action.' [Citation.] . . . [J]udges who encounter such challenges should attempt to leverage their 'experience with and flexibility in engineering solutions to difficult problems of case management,' and 'refusing to certify on manageability grounds alone should be the last resort.'" (*Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 978.) Thus, if possible, the court should work with the parties to render a PAGA claim manageable by adopting a feasible trial plan or limiting the claim's scope. (Cf. *Canon, supra*, 68 Cal.App.4th at 5 [in class action context, "the trial court has an obligation to consider the use of subclasses and other innovative procedural tools proposed by a party to certify a manageable class"]; *Petersen v. Bank of America Corp.* (2014) 232 Cal.App.4th 238, 254 [to render mass action manageable on remand, "the trial court will have the power to require plaintiffs' counsel to whip the third amended complaint's desultory and scattered allegations against [defendant] into a tightly structured set of manageable subclaims and subclasses"].) As explained below, the trial court's conclusion that the claim was unmanageable resulted not from the court's reluctance to work with the parties, but

40

from Wesson's insistence that manageability of the action was irrelevant.

b. *Analysis*

The trial court did not abuse its discretion in striking Wesson's PAGA claim.  Without offering developed arguments on the subject, each party implies that the other had the burden to prove that Wesson's PAGA claim was or was not manageable.  We need not decide the issue, as the evidence before the trial court supported its ruling, even if Staples had the burden of proving unmanageability.

Wesson's claim asserted Labor Code violations as to 346 Staples GMs, premised on Staples's alleged misclassification of those employees as exempt executives. By their nature, claims involving employee misclassification are highly fact-dependent, as the inquiry focuses on the work actually performed by the employee, as well as the employer's realistic expectations and the realistic requirements of the job.  (See, e.g., Cal. Code Regs., tit. 8, § 11070, subds. 1(A)(1)(e), 1(A)(2)(f).)  Thus, trials involving misclassification claims often involve significant amounts of factual minutiae and therefore tend to be lengthy even when they involve only a few employees.  (See, e.g., *Heyen v. Safeway Inc.* (2013) 216 Cal.App.4th 795, 799 [ten-day trial on single plaintiff's misclassification claim]; *Batze v. Safeway, Inc.*, *supra*, 10 Cal.App.5th at 475 [in bench trial on three employees' misclassification claims, "the court waded

41

through weeks of testimony from dozens of witnesses and a massive quantity of documentary evidence"].)

In the class action context, our Supreme Court acknowledged that misclassification cases "can pose difficult manageability challenges." (*Duran*, *supra*, 59 Cal.4th at 30.) It explained: "Although common proof may be possible if there are uniform job requirements or policies, an employer's liability for misclassification under most Labor Code exemptions will depend on employees' individual circumstances. Liability to one employee is in no way excused or established by the employer's classification of other employees."[16] (*Duron, supra,* at 36-37.)

The record in this case raised significant manageability concerns. Staples adduced evidence that the GM position was not standardized, and that there was great variation in how Staples GMs performed their jobs and the extent to which they performed non-exempt tasks. The evidence showed that Staples stores varied widely in size, sales volume, staffing levels, labor budgets, and other variables

---

[16] The court recognized, however, that in some cases, misclassification could be decided on a classwide basis: "A class action trial may determine that an employer is liable to an entire class for misclassification if it is shown that the employer had a consistently applied policy or uniform job requirements and expectations contrary to a Labor Code exemption, or if it knowingly encouraged a uniform de facto practice inconsistent with the exemption. [Citation.] In such a case, the evidence for uniformity among class members would be strong, and common proof would be sufficient to call for the employer to defend its claimed exemption." (*Duran*, *supra*, 59 Cal.4th at 37-38.)

that affected GMs' work experience.  Staples's evidence also showed that how GMs spent their time depended on their experience, aptitude, and managerial approaches, among other factors.  The trial court credited this evidence, and Wesson does not contest it on appeal.  Based on this evidence, Staples argued that Wesson's claims would require individualized assessments of each GM's classification and would lead to "an unmanageable mess" that "would waste the time and resources of the Court and the parties . . . ."

Wesson agreed that Staples's affirmative defense would require individualized assessments of the 346 GMs, stating in his briefing to the court that "Staples [would] need to proffer 'a GM-by-GM, week-by-week analysis' throughout the entire relevant time period that all of the GMs were properly classified as exempt executives."  And he did not suggest there was a manageable way to litigate Staples's exemption defense.  Instead, Wesson argued that the manageability inquiry need not consider a defendant's affirmative defenses, asserting that "a manager misclassification PAGA claim is 'manageable' so long as [the] [p]laintiff's prima facie case, concerning each aggrieved employee at issue, is provable by resort to common evidence."  Thus, in addressing the litigation of Staples's exemption defense in the trial plan he proposed to the court, Wesson insisted that it would be improper for him to "dictate how Staples should go about proving its exemption defense," and simply pledged that he would not attempt to prevent Staples from proving its affirmative defense as it saw fit.  At

43

the hearing on the issue, the parties estimated they would need six trial days per GM to litigate GMs' classification individually, or roughly eight years.

The evidence and argument before the trial court revealed no apparent way to litigate Staples's affirmative defense in a fair and expeditious manner, as the defense turned in large part on GMs' actual work experience, yet there was extensive variability in the group of Staples's GMs. (Cf. *Duran*, *supra*, 59 Cal.4th at 33 ["If the variability [in a class] is too great, individual issues are more likely to swamp common ones and render the class action unmanageable"].) The parties agreed that individualized litigation of the issue as to each of 346 GM would require a trial spanning several years with many hundreds of witnesses. The trial court reasonably concluded that such a trial would "not meet any definition of manageability."

To be sure, Staples would have been able to offer common proof relating to its realistic expectations as to how GMs should spend their time and the realistic requirements of the job. In the unpublished portion of this opinion, we concluded its common evidence on those issues precluded summary adjudication. But the fact that certain evidence is minimally sufficient for purposes of summary adjudication does not mean that a factfinder would find it credible and persuasive at trial. Thus, Staples could not be expected to limit its defense to common evidence on its realistic expectations and the realistic requirements of the job, while ignoring the issue of how individual GMs actually spent

44

their time -- the "first and foremost" consideration under the IWC wage order.  (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(e).)  (See *Duran, supra*, 59 Cal.4th at 33.)

Wesson's argument below that a court should ignore affirmative defenses in assessing manageability makes little sense.  That a plaintiff may prove his or her prima facie case relatively quickly and efficiently is of little comfort if any fair presentation of a cognizable defense would seize the court's resources for years to come.  (Cf. *Weiss, supra*, 9 Cal.5th at 863; *Cohn, supra*, 169 Cal.App.4th 523, 531.)

For the first time on appeal, Wesson contends that Staples had no due process right to call every GM as a witness at trial, and thus that the trial court could have rendered a trial on his claim manageable simply by limiting Staples's ability to litigate its defense individually as to each GM.  In support, Wesson points to certain language by our Supreme Court in *Duran*.  The language he references does not support his contention.

In holding that the trial court impermissibly constrained the defendant's ability to present a defense, the *Duran* court explained, "While class action defendants may not have an unfettered right to present individualized evidence in support of a defense, . . . a class action trial management plan may not foreclose the litigation of relevant affirmative defenses, even when these defenses turn on individual questions." (*Duran, supra*, 59 Cal.4th at 34.)  The court further stated:  "No case, to our knowledge, holds that a defendant has a due process right to litigate an affirmative

defense as to each individual class member. However, if liability is to be established on a classwide basis, defendants must have an opportunity to present proof of their affirmative defenses within whatever method the court and the parties fashion to try these issues." (*Id.* at 38.)

This language, cited by Wesson, indicates that a defendant is not categorically entitled, in every case, to litigate an affirmative defense individually as to each class member. (See *Duran, supra*, 59 Cal.4th at 34, 38.) Yet in the same breath, the court stressed that defendants must have a fair opportunity to litigate their affirmative defenses *in some way*, even if that entails individualized evidence. (*Ibid.*) A trial court thus may not "significantly impair[]" the defendant's ability to present a defense. (*Id.* at 33.) As discussed, the evidence before the trial court supported its determination that Staples's affirmative defense could not be fairly litigated through common proof, and no evidence before the court suggested it could.

In his reply brief, Wesson summarily asserts for the first time that Staples could have sought to manage individual issues through "'pattern and practice evidence, statistical evidence, sampling evidence, expert testimony, and other indicators of . . . centralized practices . . . .'" He made no such claim below, relying instead on the assertion that the manageability of Staples's defense was irrelevant. Moreover, nothing in the record suggested that these were feasible means of proving how individual GMs spent their time, and Wesson's argument on appeal is woefully

46

insufficient to establish that the trial court abused its discretion in concluding to the contrary.

We do not hold that a PAGA misclassification case can never be managed through common-proof methods. However, Wesson's lack of cooperation with the trial court's inquiry in this regard stymied the court's efforts to devise a plan that would allow the action to proceed, in whole or in part.  On the record before us, the trial court's determination that Wesson's PAGA claim was unmanageable was eminently reasonable.[17]  Accordingly, we find no abuse of discretion in the court's decision to strike Wesson's PAGA claim.[18]

---

[17]     As Wesson does not argue that the trial court should have rendered his claim manageable by limiting its scope, we do not consider the issue.

[18]     We reject Wesson's contention that the trial court erroneously believed he would have had the burden of disproving Staples's affirmative defense of exemption at trial.  The court's thorough and thoughtful decision reflects a clear understanding of the parties' respective burdens.

## DISPOSITION

The trial court's orders are affirmed.  Staples is awarded its costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**



MANELLA, P. J.


We concur:




COLLINS, J.




CURREY, J.